

**FILED**

JAN 1 1 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOUGLAS M. THIGPEN,

    Petitioner,

        -vs-

UNITED STATES OF AMERICA,

    Respondent.

    Civil No.

**08CV266**
**JUDGE SHADUR**
**MAGISTRATE JUDGE KEYS**

---

### MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT HIS CONVICTION OR SENTENCE, PURSUANT TO 28 U.S.C. §2255.

---

    Petitioner, Douglas M. Thigpen, ("Thigpen"), pro se, moves this honorable Court pursuant to Title 28 U.S.C. Section §2255, requesting that his conviction be vacated, or his sentence be vacated and corrected/reduced.

    In support hereof the movant states as follows:

    The legal framework for evaluating a petition under 28 U.S.C. §2255 is well-established. Relief under a §2255 claim is limited to situations where a conviction or sentence is based on "an error of law that is jurisdictional, constitutional, or constitutes a fudamental defect which inherently results in a complete miscarriage of justice." Bischel v. United States, 32 F.3d 259, 263 (7th Cir. 1994)(quoting Borre v. United States, 940 F.2d 215, 217, (7th Cir. 1991)).

    If the Court finds that any part of the foregoing errors did occur, then it must vacate and set aside the judgment, and discharge, resentence, or retry the prisoner as appropriate. 28 U.S.C. §2255. When reviewing a §2255 petition, the district Court must review the entire record, and draw all reasonable inferences in favor of both the defendant and the government. Carnine v. United States, 974 F.2d 924, 928 (7th Cir. 1992).

This Court must note that <u>Thigpen</u> has filed his petition <u>pro se</u>, and thus his petition is entitled to a liberal reading.

## PROCEDURAL HISTORY

On December 9, 2003, Defendant-Petitioner, Douglas M. Thigpen was indicted for bank robbery in violation of 18 U.S.C. § 2113(a). (R. at #6.) He filed a "Plea Declaration" and pled guilty to the sole count of the indictment on August 27, 2004. (R. at ##26,27.). The district Court accepted the guilty plea on the same date.

The United States Probation Office prepared a Presentence Investigation Report (PSR) on December 3, 2004, which was revised on April 15, 2005. (PSR at 1.). The government filed its version of the offense on September 7, 2004. (Gov't Version at 1.). Mr. Thigpen filed a sentencing memoranda contesting the applicability of the career offender guidelines on March 11, 2005; March 23, 2005; and March 25, 2005. (R. at ##34,35,48.).

The district Court held a sentencing hearing on March 24, 2005. (Sent. Tr. at 2.). After denying Mr. Thigpen's objections to the career offender guidelines, the district Court imposed a sentence of 151 months in prison, a three year term of Supervised Release, a $100.00 special assessment, and restitution in the amount of $2,204, (App. at 1). Mr. Thigpen filed a timely notice of appeal was filed March 30, 2005.

The Seventh Circuit Court of Appeals affirmed Mr. Thigpen's conviction and sentence by opinion on August 7, 2006. (App. at 2.).

A Petition for a Writ of Certiorari followed, and was denied by the United States Supreme Court on January 8, 2007.

-2-

## STATEMENT OF FACTS

On October 25, 2003, Defendant-Petitioner, Douglas Thigpen entered a TCF Bank located in a Jewel grocery store in Glendale Heights, Illinois. (COP Tr. at 19-20). Mr. Thigpen approached one of the tellers and stated, "if you don't give me the money something bad will happen" (PSR at 2.). The teller then noticed that Thigpen, was holding a blue posted note with "Robbery" written on it. (PSR at 2). The teller gave Thigpen $2,204, in U.S. Currency, and Mr. Thigpen left the bank and grocery store. (COP Tr. at 20-21).

The defendant's sister went to the Bloomingdale Police Department sometime in September 2003, complaining that she had allegedly been robbed by one of Mr. Thigpen's associates. The sister had her then twelve year old daughter Arielle Thigpen present with her at the station. Arielle (a twelve year old) volunteered information to the police without warrant or corroboration that her uncle Doug (Thigpen), had robbed a bank. This is what initiated the investigation from its start. The Police took that statement from the twelve year old and without corroboration placed the Petitioner in a photo line-up. He was subsequently identified by one of the bank tellers.

On November 13, 2003, Mr. Thigpen was arrested by the Elmhusrt, Illinois Police Department, due to being wanted for questioning in federal bank robbery investigation. The Elmhurst Police arrested him without a warrant and without telling him why he was being held. Thigpen was detained until the next morning on November 14, 2003, and then was picked up by FBI agent Sam Dorger and Glendale Heights, police officer Dectective Sherry Bailey, and taken to the Federal Dirksen Building. A warrant for his arrest was not issued until

he was already in custody at the federal building. Thigpen was coerced by agent Kaley into making a confession of guilt, due to the agent promising him leniency and saying he would speak to the Court on Thigpen's behalf. The confession was made without counsel being present, and the Miranda waiver was signed after he had made the confession.

Thigpen was arrested without a warrant first being issued for his arrest.

As a result, Mr. Thigpen was indicted for bank robbery in violation of 18 U.S.C. § 2113(a). (R. at #6). He filed a "Plea Declaration" and pled guilty to the sole count of the indictment. (App. at 1). No FDIC Certificate of the bank being insured at the time of the robbery was submitted before the Court at the change of plea hearing, or before the Grand Jury. The government failed to prove an essential element, being the banks FDIC status.

Thigpen's failed to object to the governments failure to show the FDIC insurance certificate. Counsel moreorless agreed without Thigpen's consent, or without explaining the necessity of proving this element, to Mr. Thigpen.

As part of his guilty plea, Mr. Thigpen admitted he took money by force or intimidation from the person of a bank teller, belonging to and in the possession of a bank when the deposits of the bank were insured, "without knowing that this particular element had not been proven and needed to be proven" his plea was not Knowing. Because he admitted that the bank was insured by a the Federal Deposit Insurance Coporation. (COP Tr.#22); (App. at 1-2). He also admitted he received approximately $2,200 in United States Currency

during the robbery. (COP Tr. at 21).

The Probation Officer submitted the PSR in anticipation of sentencing, utilizing the 2004 version of the Sentencing Guideline. (PSR at 3). Mr. Thigpen's base offenselevel was 20 under §2B3.1(a). (PSR at 4). The officer then determined Mr. Thigpen qualified as a career offender under the provisions of §4B1.1(a) because he was over 18 years old at the time of the offense, the present offense was a crime of violence, and he had two prior felony convictions for either a crime of violence or a controlled substance offense. (PSR at 6). The officer stated Mr. Thigpen's qualifying convictions were "robbery, aggrevated battery, and possession of a controlled substance with intent to deliver." (PSR at 6). With a reduction for acceptance of acceptance of responsibility, Mr. Thigpen's offense level was 29. (PSR at 6).

Mr. Thigpen had a total of 59 criminal history points. (PSR at 25). Most of theses points were given for non-violent offenses such as forgery, deceptive practices, and obstruction of justice.

However, three of his previous convictions were considered by the probation officer as either crimes of violence or controlled substance offenses for career offender purposes. Only these three offenses are relevant to the issue raised in ground one of the §2255 motion.

The first offense was a 1990 conviction for robbery and aggrevated battery ("the robbery offense was used"). (PSR at 13). Mr. Thigpen was sentenced to three and a half years in the Illinos Department of Corrections for this offense. (PSR at 13). The officer described the offenses as follows: "According to the indictment,

-5-

the defendant, on August 8, 1989, committed robbery when he took a purse, $175, and a check for $15,700, from the victim by use of force. Furthermore, he cause bodily harm to the victim when he grabbed her purse and dragged her by the purse. ( Furthermore, he caused bodily harm when he grabbed her purse and dragged her by the purse-was not included in his indictment). (PSR at 13). In actuallity this case involved Thigpen and his ex-girlfriend, whom both were involved in cashing stolen checks. The girlfriend had stole the stolen check from Thigpen, who took her purse to regain possession of the stolen $15,700 check. The $175 was given back to the girlfriend. The Court adopted the PSR's version of this offense, causing the Court to erroneously look at facts beyond the indictment or record of conviction itself.

The second offense was a drug offense committed in 1992 ("the drug offense"). (PSR at 15). Mr. Thigpen was sentenced to four years in the Illinois Department of Corrections for this offense. (PSR at 15). The probation officer described the offense as follows:

According to the Chicago, Illinois Police Department arrest report, the defendant was arrested for possession of a controlled substance with intent to deliver, when he was obeserved dropping ten plastic bags containing white powder, suspect [sic] to be cocaine. A custodial search revealed a tin foil packet containing a green crushed plant laced with PCP.

The defendant was arrested using the alias name Leonard Spears and the alias date of birth January 3, 1965.

Although the defendant's sentence was run consecutive to  Dkt. No. 89 CF 763, Mr. Thigpen is not the defendant named in that case.

The Court errored by adopting this out of the PSR, In light of

-6-

Shepard, the Court cannot look at police reports, or the Cook
County States Attorney's Office statement of facts allegedly
surrounding what occurred with the arrest incident. The Court did
that to determine whether this offense could be used for career
offender purposes.

Furthermore, the Court looked at a bond refund reciept to
resolve a dispute as to identity. The Court erroneously looked
at the police reports and bond refund slips to resolve the dispute
as to whether Mr. Thigpen and Leonard Spears were the same person.

This case was originally charged as a simple possession of
cocaine in the combined drug amount of .40 of a gram, that the
defendant went to purchase for his own personal use, and was caught
by police. The police charged him with the offense because the
defendant was unable to give the corrupt police a firearm in
exchange for his freedom. The case was eventially upgraded to
possession with the intent to deliver less than on gram of substance
containing cocaine.

The third offense was an aggrevated battery offense committed
in 1999 ("the aggrevated battery offense was used as predicate").
(PSR at 15). Mr. Thigpen was sentenced to four years in the Illinois
Department of Corrections. (PSR at 15). The probation officer
described the offense as follows:

According to the statement provided by the Dupage County,
Illinois Assistant State's Attorney's Office, the defendant was a
passenger in a vehicle stopped for a traffic violation. He consented
to a search of his person. The defendant then attempted to hide
four foil packets of heroin on a number of occasions. On one occa-
sion, he attempted to swollow the packets. Officers forced him
to open his mouth and the defendant bit an officer's finger.

The officer was treated at a hospital.

(PSR at 22; emphasis added).

Mr. Thigpen objected to his classification as a career offender and argued the government had not met its burden to prove he was a career offender.(R. at #35). He also argued that, under Shepard v. United States, the court could not make a decision on whether Mr. Thigpen qualified as a career offender using arrest reports and other non-reliable sources. (R. at #35). The Court errored by looking at the Statement of Facts, and adopting this in the PSR in order to make a factual finding that Mr. Thigpen, was a career offender.

The government and probation officer did not issue written responses to these arguments made by the defendant in his two sentencing memorandums.

At the sentencing hearing, the following exchange occurred regarding Mr. Thigpen's criminal history and the possible career offender qualifying offenses:

DEFENSE COUNSEL: I think, your Honor, I think it would be useful, but let's identify these offenses--

THE COURT: Yes.

DEFENSE COUNSEL: --because there is not that many, They are discussed at some length in my document, but--

THE COURT: It's--

DEFENSE COUNSEL: --so that we have it clear, because--

THE COURT: It seems to me that I think that's accurate. If you take look at the robbery and aggrevated battery offenses that [are] found at page 14, it covers lines 354 through 360,

-8-



it seems to me that that qualifies for that purpose, unless counsel thinks otherwise.

DEFENSE COUNSEL: Judge, we have said all that we want to say about that in the sentencing memo. We don't dispute that Mr. Thigpen was involved in the events that are described here.

THE COURT: Well, I understand. But what I am saying is that not just that he's not disputing that, but rather what it does in terms of qualifying as one of the prior offenses for purpose of guideline §4B1.1(a).

DEFENSE COUNSEL: I understand, Judge. And we are back with the difficulty that I started this hearing with. I think Mr. Thigpen will -- and I need to ask him his -- I think on the record, acknowledges he is the person who did this and that was convicted of those offenses. Is that true?

DEFENDANT THIGPEN: I won't admit to that. I wanted to file this -- I wanted to adopt Apprendi. I don't want to admit to the prior convictions. I don't --

THE COURT: All right. Well --

DEFENDANT THIGPEN: I am asking that I have a jury determination on that. I don't want to admit to it.

THE COURT: Well --

DEFENSE COUNSEL: Let me add something, although I am not exactly sure what it is going to be. I advised Mr. Thigpen that there was a difference between taking a legal position which he has done in which he has preserved before this Court, and acknowledging the facts of what occurred is a part of an effort is to first of all accept responsibility in connection with pleading guilty. And I would assume that he would do that.

-9-

THE COURT: Whatever Mr. Thigpen's perspective is along those lines, the fact remains that under current law which includes Alemdarez-Torres, the Court is in a position to make a finding on that score. And I have reviewed not only the presentence report but also the bulky materials that have been supplied in conjunction with the presentence report. And I find that the offense is one that is included for purposes of the application of career offender determination.

DEFENSE COUNSEL: We have nothing to add to that, your Honor. Thank you.

THE COURT: Now second, since the issue has been raised, if you turn to page 23 at lines 525 to 535, that includes a drug offense as well as aggravated battery to a police officer. And my determination is that also qualifies for purposes of career offender determination?

And the only think that I would ask along those lines is whether other than the issue that Mr. Thigpen has identified, and I assume he would want to be consistent in this respect, whether there is any basis for any disagreement with that determination?

DEFENDANT THIGPEN: I don't want to admit to that one neither, your Honor.

THE COURT: I am not asking whether you do or do not. I have got to tell you, you know, in a sense you are threading on thin ice because I am not going to punish you for this one, but I have got to tell you, you know I could well say that you are running a risk on acceptance of responsibility when you do that. And your lawyer has been very careful to try to explain something

-10-

to you about that.

DEFENDANT THIGPEN: Okay.

THE COURT: But I am really asking counsel, I recognize your position, but I am asking counsel whether other than the point that Mr. Thigpen has raised whether there is any predicate for disagreement with what I have said?

DEFENSE COUNSEL: No, your Honor, there is not.

(Thigpen clearly did not give his counsent to his lawyer making this admittion, there was a predicate for disagreement, because Thigpen did not want to admit to any prior convictions, and his counsel done so without Thigpen's consent to do so.).

THE COURT: Okay.

The third thing that I wanted to comment on has to do with the Leonard Spears matter and any question that was raised about that. Now I am not sure whether there is still some because of that mix-up that had to do with that concurrent sentence, which struck everybody as peculiar, whether there is some kind of contention in that respect that that's not an accountible matter. But on that score, I went back and I looked at some of the supporting papers. And I found that included in those was a request for application of the bail funds that were provided, and that those should be returned to counsel. And that application read, "Leonard Spears, also known as Douglas Thigpen," and it was signed by Mr. Thigpen. And that being true, it seems to me that there is really no room, in candor, for argument that that's not also one, although you only need two and you don't have to go beyond two, my determination

-11-

is that that also at a minimum is also countable toward the
career offender and suffices to kick that provision into play.

Let me ask once again. I don't know wheter he wants to take
the same position on that one. But I would ask counsel wheter
you see any predicate for disagreeing, with the Court's determ-
ination in that respect?

THE DEFENSE COUNSEL: I don't your Honor. But could we be clear on
which offense it is? I am embarrased to say --

THE COURT: All right. Just a minute.

PROSECUTOR: I have got the page right here, your Honor.
It's page 16 lines 392 through 403.

THE COURT: Right.

PROSECUTOR: And your Honor, may I ask --

DEFENSE COUNSEL: Excuse me. That's the one that's addressed
at length in the supplemental and in my letter to the Court.
And I did go back, and I also found an apperance which was signed
by an attorney on behalf of Leonard Spears, also known as
Douglas Thigpen. And we in our sentencing memo discussed the
facts of this and argue about the relevance of these facts and
and acknowledges that he was the person involved.

(Mr. Thigpen had already answered this question prior when the
court asked him did he want to admit to any prior convictions. It
was the defendant's sole position not to admit to any of the prior
convictions, and his counsel knew this. Counsel made yet another
admittion to a prior conviction without Mr. Thigpen's consent, thus
causing counsel to be ineffective.).

(Sent. Tr. 11-14; App. at 13-16.) The district court concluded

-12-

Mr. Thigpen qualified as a career offender, because at least two of
his prior offenses that were also crimes of violence or drug
offenses..... (Sent. Tr. at 29; App. at 24). The Court did not
specifically rule on whether it could correctly consider the police
reports and prosecutor's statements of facts under Shepard.
(The Court errored by looking at the defendants supporting papers,
and his bond funds recipt, and attorney's appearance, to make its
factual finding to resolve the dispute as to whether or not
Mr. Tigpen and Leonard Spears was the same person.).

The Court's final sentencing determination was:

Despite the enormously high level of criminal history points
this is, I find, a difficult case. Indeed, it is a case that I
think demonstrates the un-wisdom of the decision that was made a
number of years ago when parole was eliminated from the federal
system. I say that because all of us who sit in the sentencing
position are in a situation in which we have to make a predict-
ion about future conduct. Nobody has total insight into that.
Nobody has an unclouded crystal ball in in that regard. And
it was I think much better to have a system in which a current
decision could be made later on by authorities who had the
opportunity to observe the manner in which a defendant actually
conducted himself or herself in the prison system, so that the
Court's determination could be made at the beginning based on
what appeared to be fair, but then that determination could
later get modified.

Regrettably, that's no longer true. And I say that because
I find it particularly difficult to get out from under what is
really, despite the fact that it is called an advisory [sic]
signal that we have already gotten from the Seventh Circuit that
essentially talks a sort of different language. The Seventh
Circuit has I think made it pretty plain that -- and the
Sentencing Commission as well, because they are keeping statistics

-13-

and even worse Congress as well, because they are keeping statis-
tics -- that the Guidelines, although advisory, might I guess
fairly be characterized as strongly advisory.

. . .

Accordingly what I have concluded is that a sentence at the
bottom of the guideline range best fulfills all the goals of
sentencing. If Mr. Thigpen conducts himself, as I hope he will
while in prison, he can earn good time that would operate --
let me just take a quick look here -- would operate to reduce
the bottom of the guidelines range of 151 months by almost two
years, so that we are looking at about 10 and a half years of
hard time, which would place him in his early to mid 50s at the
time of release.

And I will repeat, having said that, that I really regret that
under the system as it now exist the sentence that's pronounced
now is the the sentence and is not subject to adjustment based
on further events.

(Sent. Tr. at 51-54).


Though Mr. Thigpen's counsel stated in his supplemental
sentencing memorandum that in light of <u>Shepard</u> the Court not
use inappropriate material such as police reports, or statements
of facts. Counsel dropped the ball at sentencing, and failed to
object to the sentencing Court using this inappropriate material,
causing counsel to be ineffective for forfieting the defendant's
<u>shepard</u> argument.

Furthermore, counsel failed to prperly file the defendant's
enlargement to his supplemental sentencing memorandum. The defen-
prepared a enlargement to his supplemental sentencing memorandum,
in support of his <u>Almendarez-Torres</u> argument. Instead of counsel
asking for a recess to overlook, file, then argue its contents,

such as police reports, prosecutor statement of facts, and bond refund slips to make its determination that the Petitioner was a career offender.

The supporting facts will be described in points as: a),b), and c), same as is presnted in the aforementioned grounds.

Supporting facts: a) That when attorney Gareth Morris was appointed to represent the defendant, Mr. Thigpen, told counsel that the police had been given the information concerning the instant offense from his twelve year old neice and his sister. The Petitioner also told counsel that he had been arrested by the Elmhurst Illinois Police department without a warrant, and held against his will until he was picked up by the FBI for questioning the next day. Last, he told counsel that the FBI had coerced him into making a statement somewhat implicating himself, without counsel being present when the statement was made, and the FBI had obtained the warrant for his arrest after he was already in federal custody.

Thigpen asked his lawyer to file a suppression motion on his behalf to have his unlawful arrest quashed. But counsel told him that he would not prevail because of the statement he made at the time of his arrest. Thigpen, then asked counsel could he get the statement suppressed and he said no.

Counsel was ineffective for failing to raise a Fourth Amendment defense on Mr.Thigpen's behalf, as Thigpen requested he do. Mr. Thigpen, could have possibly had his arrest quashed, and he had a meritorious Fourth Amendment claim alleging that his warrant-less arrest violated the Fourth Amendment of the U.S. Const. and it didn't matter whether he had somewhat confessed or not.

The alleged confession was obtained by means of coercion by agent
Kaley, and it was obtained without counsel being present on the
petitioner's behalf. The petitioner was prejudiced by his lawyers
inadequacy, only if that inadequacy created a risk of convincing
an innocent person. Provided the evidence was obtained in a
illegal arrest or by coercion is reliable, suppressing that evidence
is not required to protect the innocent -- it is merely a tool
-for deterring violations of the Fourth Amendment.

Petitioner's counsel was ineffective in not moving to suppress
his confession as the poisonous fruit of his arrest  or unlawful
seizure. See: Strickland v. Washington, 466 U.S. 668, 689, 80
L.Ed. 2d 674, 104 S.Ct. 2052 (1984).

The Sixth Amendment does provide a remedy for counsel's failure
to argue a Fourth Amendment defense, because a defendant is preju-
diced by counsel's failure to do so. See: Kimmelman v. Morrison,
477 U.S. 365, 383, 91 L.Ed. 2d 305, 106 S.Ct. 2574 (1986).

To satisfy the <u>Strickland</u> test where the asserted attorney error
is a defaulted Fourth Amendment claim, a defendant only needs to
that he had a meritorious Fourth Amendment claim, and Thigpen, has
shown that. And he will spread more emphasis on the issue in reply.
See: United States v. Jackson, 103 F.3d 561, 573 (7th Cir. 1996).

b) That attorney Gareth Morris, was ineffective for failing to
make the government prove that TCF Bank was FDIC insured at the
time of the robbery, at the grand jury, and at the change of plea
hearing, which was an essential element of the offense that in
turn establishes jurisdiction.

The lawyer, stood before the Court and stipulated or admitted to this crucial element, without explaining the seriousness of the element to Mr. Thigpen, and getting a knowledgable consent from Mr. Thigpen, to admit to this fact...

Mr. Thigpen had no clue that this was an essential element that had to be prove by the government beyond a reasonable doubt, in order to establish jurisdiction. See: United States v. Slovacek, 867 F.2d 842, 845 (5th Cir.); and United States v. Schultz, 17 F. 3d 723 (5th Cir. 1994); United States v. Locklear, 97 F.3d 196 (7th Cir. 1996). Thigpen, did not give counsel his consent to stipulate to this fact. Counsel made the stipulation in open court and asked Thigpen did he agree, and Thigpen dumb foundedly agreed because counsel had not explained to him what he was agreeing to or the consequences of the stipulation. The consent or stipulation agreement be Thigpen was not knowing. See: (COP Tr. page 22 , in Appx.).

Mr. Thigpen's conviction must be vacated, and he is entitled to a presumption of prejudice under, United States v. Cronic, 466 U.S. 648, 80 L.Ed. 2d 657, 104 S.Ct. 2039 (1984).

Though counsel claimed he had spoken to a bank representitive who insured him the bank was in fact insurred, does not prove the element. The government is required to show a Certificate of insurance or offer testimony from a bank employee.

Mr. Thigpen's conviction must be vacated, because his agreement to the stipulation and his plea was not knowing.

c) That Attorney Gareth Morris prejudiced the Petitioner's defense by failing to make a timely assertion of Mr. Thigpen's rights-

under Shepard v. United States, 544 U.S. 13 (2005). Where the
district Court erred by considering inappropriate materials at
sentencing in violation of Shepard to determine if Mr. Thigpen's
prior convictions were crimes of violence or drug trafficking
offenses, and to resolve a dispute as to identity.

Counsel cited Shepard in Thigpen's supplemental sentencing
memorandum, mentioning the diminished reliability of police reports
for career offender purposes. But counsel failed to properly deve-
lop a Shepard  argument at sentencing. Counsel stood by and allowed
the Court look beyond the record of conviction itself, at Police
Reports, Prosecutor Statement of facts, and bail refund reciepts,
without objecting to this on Thigpen's behalf after he had made
the Shepard argument in sentencing memorandum. The Court erroneous-
ly looked at these materials to determine if Thigpen's prior
convictions were crimes of violence or drug trafficking offenses.
See:(Sent. Tr. pages _____, and ____). The Court also, looked at
the appearance of counsel papers and a bail bond reciept to
resolve a dispute as to identity of whether Mr. Thigpen was also
an individual named Leonard Spears. Counsel was ineffective for
forfieting this Shepard argument and not objecting to same. The
defendant was prejudiced by counsel's performance at sentencing.

The Court also adopted this same language from the PSR, and the
Court was not allowed to do that in light of United States v. Hagenow,
423 F.3d 638, 644 (7th Cir. 2005).But counsel failed to object to
that as well, further showing he was ineffective. Counsel's
handling of the Petitioner's defense at sentencing failed to come
up to minimum professional standards (he dropped the ball). See:

-18-

Strickland v. Washington, 466 U.S. 668 (1984); and United States
v. Cronic, 466 U.S. 648 (1984). The lawyers actions constituted a
denial of counsel.

---

Sixth Amendment ineffective assistance of counsel claims are often
raised collaterally in a petition under 28 U.S.C.S. §2255, to allow
for supplementation of the record with evidence pertinent to the
asserted claim.

Mr. Thigpen failed to advance his ineffectiveness claim on
direct appeal because he needed to supplement the trial record.
And his appellate counsel advised him not to raise the issue on
direct appeal or raise his Almendarez-Torres claim on direct appeal,
because the record didn't show enough to support an ineffective
claim as of yet, and Almendarez-Torres was still good law, also
that she might get disbarred.

A defendant may challenge his conviction and sentence under
§2255 on a ground not raised on direct appeal by showing: (1) both
good cause for his failure to raise the issue on direct appeal and
actual prejudice from the newly discovered or asserted errors.
See: United States v. Frady, 456 U.S. 152, 168, 71 L.Ed 2d 816, 102
S.Ct. 1584 (1982); or (2) that the district Court's refusal to
consider the issue on procedural grounds would lead to a fundamental
miscarriage of justice. See: Smith v. Murray, 477 U.S. 527 (1986).
One possible cause for movant's failure to raise his ineffective
issue on direct appeal may be that appellate counsel themselves were
ineffective. See: Velarde v. United States, 972 F.2d 826, 827
(7th Cir. 1992). For instance, appellate counsel may be constitution-

ally deficient in ommitting a dead-bang winner even while zealously
pressing other strong (but unsuccessful) claim. See: Page v. 884
F.2d 300, 302 (7th Cir. 1989). That dead-bang winner could be the
argument that trial counsel made errors so serious (as in Thigpen's
case) that counsel's representation fell outside the wide range of
professionally competent assistance. Strickland v. washington, 466
U.S. 669, 690, 80 L.Ed 2d 674, 104 S.Ct. 2052 (1984); see also,
Evitts v. Lucey, 469 U.S. 387, 397, 83 L.Ed 2d 821, 105 S.Ct. 830
(1985). It was just broght to light in the petitioner's direct
appeal opinion as to the seriousness of counsel's ineffectiveness,
and the forfieture of Thigpen's rights under Shepard, which did
occur at sentencing.

That Mr. Thigpen's conviction must be vacated or his sentence
be vacated and he be re-sentenced to 63 to 78 months in prison.


Ground two: That the defendants Fourth Amendment constitutional
right was violated at the time of his arrest. Where his arrest was
made by the Elmhurst Illinois Police without probable cause, and
without a warrant first being issued.

Supporting Facts: That Mr. Thigpen was subsequently arrested by
the Elmhurst Illinois Police Department, and held against his will
without probable cause or without a warrant first being issued.
Thigpen's arrest violated the Fourth Amendment and should had
been quashed. See: The Fourth Amendment of the U.S. Const. (emphasis
added); and Gerstien v. Pugh, 420 U.S. 103. Mr. Thigpen was held
against his will for an excessive period of time, from 11/13/2003
to 11/14/2003, until he was picked up by federal agents for question-

ing in a bank robbery. A warrant was not issued for Thigpen's arrest until after he was laready being held in federal custody at the Federal Dirksen Building in Chicago.

Mr. Thigpen's conviction must be vacated and his arrest be quashed.

Ground three: That the defendant's alleged confession was obtained in violation of his Fourth Amendment constitutional rights. Where the confession was obtained through coercion of a federal agent's promise to release the defendant and be lenient on him. Also, the statement was made without counsel being present.
Supporting facts: That the defendant's statement which he made at the time of his arrest should have been suppressed as the fruits of a poisonous tree. The confession was obtained through coercion by agent Kaley promising he would feed the petitioner, ask that he be released on bail, and come before the Court and ask for leniency on the defendants behalf. Also, the statement was obtained without counsel being present. The statement must be suppresed. See: The Fourth Amendment of the U.S. Const.; and the Fruits of a Poisonous Tree Doctrine.(emphasis added).

Ground Four: That the Court was without jurisdiction to convict the defendant for bank robbery. Because the government failed to prove to the Grang Jury and to the Court at change of plea, that TCF Bank was FDIC insured beyond a reasonable doubt.

Supporting facts: That the government was without jurisdiction to charge and indict Mr. Thigpen, without proving that TCF Bank

was FDIC insured to the GRand Jury, by showing of the Bank's
FDIC insurance certificate or presenting testimony from its bank
Manager. The Court was ithout express jurisdiction to convict
Mr. Thigpen for robbing a federally insured bank. The government
not once showed proof of this element, and they this was required.
The proof that this bank was FDIC insured was an essential element
that establishes jurisdicton.

Though counsel stipulated to this element and had the defendant
to agree to that stipulation at Change of Plea. Counsel never
explained to Thigpen that it was a essential element to establish
jurisdiction. Therefore Mr. Thigpen's agreement to that consent
was not knowing or consentual.

Mr. Thigpen's conviction and sentence must be vacated, and he
be released from prison. See: United States v. Slovacek, 867 F.2d
842, 845 (5th Cir. 1989); and United States v. Schultz, 17 F.3d
723(5th Cir. 1994); United States v. Locklear, 97 F.3d 196 (7th
Cir. 1996).

Ground five: The district court erroneously  considered inappro-
priate materials in violation of Shepard v. United States, 544 U.S.
13 (2005); to determine if Mr. Thigpen's prior convictions were
crimes of violence or drug trafficking offenses by looking beyond
the record of conviction itself, by looking at Police Reports;
Prosecutors Post Statement of Facts; Appearance of counsel papers
and bail bond refund reciepts (to resolve a dispute as to identity
of whether Thigpen and Leonard Spears were the same person); and
the Court erroneously adopted the PSR in violation of Hagenow.

The Court erred in looking at these items. The Court went

far beyond the fact of prior convictions exception specified in
<u>Apprendi</u> and originated in Almedarez-Torres v. United States,
523 U.S. 224 (1998), by relying on facts outside of the prior
indictments, to resolve a disputed fact about identity.

It was clear that Thigpen did not want to admit any of
these facts to prior conviction. But his counsel once again dropped
the ball and admitted to 2 of the prior convictions clearly
without Thigpen's consent.

The Court looked at improper material to determine whether
Thigpen's prior convictions were crimes of violence or serious
drug trafficking offenses that could be used as predicate offenses
for career offender purposes. Inlight of <u>Shepard</u>, Taylor v. United
States, 495 U.S. 575, 600 (1990); United States v. Jones, 235 F.3d
342, 347 (7th Cir. 2000); and United States v. Lewis, 405 F. 3d
511,515 (7th Cir. 200), Thigpen's sentence must be vacated
and he be resentenced to 63 to 78 months. The government failed
to meet its burden, and the sentencing Court violated Shepard.
Therefore Thigpen's career offender sentence cannot stand.

<u>Ground Six</u>:  That in light of In re Winship, 397 U.S. 358, 364
(1970), Mr. Thigpen's 5th Amendment rights were violated at the
time of sentencing.

<u>Supporting Facts</u>:  That in light of <u>In re Winship</u>, the sentencing
Court was without authority to sentence the defendant as a career
offender, without his prior convictions first being cahrged in
his core indictment then proven. Thigpen's challenges the accuracy
of his indictment and <u>Almendarez-Torres</u> exception. <u>Almendarez-Torres</u>,

cannot apply to career offender predicate prior convictions.
Because the Career Offender provision acts as a seperate crime
to be punished, and the provision bear similarities to the Habitual
Criminal Act. Therefore to satisfy Notice and Due Process the
prior convictions must be averred and then proven. See: Apprendi,
and Plumbly v. Commonwealth, 43 Mass. 505; Tuttle v. Commonwwealth,
68 Mass., at 506 (1854).

Mr. Thigpen's career offender sentence must be vacated
and he be resentenced to 63 to 78 months in prison.

Ground seven: That the defendant's plea was unknowing, and must be
vacated, due to being obtained in violation of the 6th Amendment.

Supporting facts: That the defendant's counsel failed to explain
to him that the government had to prove that the TCF Bank was
federally insured, by showing the actual FDIC Certificate to
establish jurisdiction. If the defendant had known this he would
not have pled guilty.

The defendant must be allowed to withdraw his plea.

Ground eight: That §994 (h) violates the constitution and it
must be deemed as unconstitutional in its entirety.

Supporting facts: §994 (h), violates the constitution because it's
discriminatory. It fails to request or supply notice for bank
robbery offenses, but it requires notice for drug offenses.
When the enhancment provision authorizes enhancements for both
crimes of violence due to prior conviction. If it requires notice



for drug crimes under §851, it should have a notice vehicle for bank robbery too.

## CONCLUSION

That Mr. Douglas M. Thigpen, respectfully request that this Court Order an evidentiary hearing in this matter and his conviction and or sentence be vacated, or he be resentenced to 63 to 78 months. Or in option his sentence reduced.

Respectfully Submitted

_____

Mr. Douglas M. Thigpen

-END-

2-Issues to be Sealed

Ground  *Nine:*  That the Petitioner's prosecution was selective,
thus violating his Constitutional rights as guaranteed to him
under the United States Constitution.

Supporting facts:  That the government knew that another indivisual
by the name of Horace Smith was personally involved in the bank
robbery with the Petitioner, but they refused to charge this guy,
even though the petitioner had implicated him immediately at the
time of his arrest, and Store witness David L. Aremka, and the
defendant's sister had clearly implicated Smith as being involved
with the crime as well. See: (Statements from Petitioner; his
sister; and David L. Aremka. Also, see the government plea agree-
ment drafts, all attached in Appx.). The government only excuse
for not charging Smith was that a jury wouldn't believe the
Petitioner due to his criminal history. Smith should have been
charged. FBI agent Kaley botched up the investigation by confront-
Smith, instead of continuing wiretap assistance from the Petitioner
to incriminate Smith. Kaley done this to insure that the Petitioner
would not receive the one half off of his sentence as was promised
to him by the government. Kaley was agry because the Petitioner
busied himself in investigations with other agencies instead of
assisting agent Kaley, in setting up Robert Perry, on a Murder
charge. Perry was another bank robber whom was suspected of a
murder. Smith played a significant role in this crime and should
have been charged. Look at the facts, David L. Aremka, saw Smith
pull the car out around the medium as Petitioner was exiting
bank, then pulls way up in front of Petitioner, and pushes open

the passenger side door as his truck was still moving. The Petition-
er had to run to catch up to the the truck, so its clear this was
pre-planned. Smith swings the door open Smith let's Petitioner hop
in the truck and Smith speeds off. Infact the robbery was Smith's
entire idea, and the Petiotioner told the government this at the
time of his arrest, and yes a jury would have believed the Petition-
er. Whether they would or wouldn't Smith should have been Charged.
Or the Petioner still should have been given one third off his
sentence for his cooperation. The governments version of the offense
and it draft plea agreement stated the crime occurred at the
suggestion of Smith and the two parties agreed to commit the crime.
See: (Govt.'s version of offense pages and draft plea agreement in
Appx.).

The Petitioner must be given one third off his sentence as
he is entitled to and was promised by the government, he should
not be deprived of that because of agent Kaleys error in obstruct-
ing the Smith investigation. Smith's statement conflicts with
the statement given by all parties anyway. See: (Statements from
Petitioner, the sister, ad Aremka, in Appx.).

<u>Ground</u>  *Ten*    That the Petitioner is entitled to one third to
one half off his sentence for cooperation.

<u>Supporting facts</u>:  That the Petiotioner assisted the ATF and the
government in investigations involving; 1) Rynell Coleman, who has
now been arrested by the government; and 2) Travis Jenkins, who has
been arrested, convicted and sentenced to 10 years in prison, due

to information and cellular phine number that was given to agents through proffer from the Petitioner. The Petitioner was promised time off but never got any off. His cooporation has caused his family and himself to be threatened, and his family had to re-locate to another community.

The Petitioner was promised one half off for Rynell Colmeman, and more time off for others. He told agents about drug dealings that occurred with these individuals and he called them to attempt to purchase drugs. He gave authorities Travis Jenkins, phone number which was eventually tapped.

Petitioner, must be given one third to one half off the low end of his sentence due to his cooporation efforts, and due to the possible dangers it has caused himself and his family.

Request to Court: That the Petitioner is requesting that the Court Order the contents of grounds    and   , sealed for the Petitioner's safety, because he is presently serving time in a USP Terre Haute, and it could cost him his life if this information leaked off or was allowed to be public information.

## APPENDIX

Pages

1-2, Statement from David L. Aremka- Store employee

3-4, statement from Iris Reminajes - Bank Teller

5-6, statement from Melinda Beckley-Bank teller

7-8, statement from Jay A. Castillo-Bank teller

9  , statement from Christine Thigpen-defendant's Mother

10-11, a statement from Arlinder Thigpen-defendant's sister

12-17, statement, Marada waiver, Search consen-Defendant

18-19, statement from Horace Smith- defendant's driver

20   , Indictment

21-26, Defendant's plea declaration

27   , Copy of COP hearing were counsel made unconsented stipulation.

28-32, Supplemental sentencing memorandum, where counsel raised a
       Shepard argument, or simi objection.

33-46, Defendant's enlargement to sentencing memorandum, arguing
       his intent to adopt Apprendi and Challenge prior convictios.

47-52, Defendant's Sent. Tr. were he refused to admit to prior
       convictions, adopted Apprendi, challenged Almendarez-Torres,
       and did not consent to counsel admitting facts.

53   , Sent. Tr. where Court erroneously looked at counsel appearance,
       and bond slip to resolve dispute as to identity.


Other- is letters from counsel's, appeal opinion, and denial of Cert.

FD-302 (Rev. 10-6-95)

- 1 -

COPY

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    10/28/2003

DAVID L. AREMKA

　　　　　　　　　　　　　　　　　　was interviewed at the GLENDALE HEIGHTS POLICE DEPARTMENT by SPECIAL AGENT (SA) CURTIS G. KOCH and GLENDALE HEIGHTS POLICE DEPARTMENT DETECTIVE SHERRY BALEY.  SA KOCH identified himself as a Special Agent with the FEDERAL BUREAU OF INVESTIGATION (FBI) and explained the purpose and nature of the interview to AREMKA.  AREMKA voluntarily provided the following information regarding his observation of a bank robbery which occurred at the TCF BANK, 2164 Bloomingdale Road, Glendale Heights, Illinois located at the intersection of Bloomingdale Road and Army Trail Road:

　　　　AREMKA stated he was working as·a bagger for the JEWEL FOOD STORE when the robbery occurred. AREMKA stated he has been working as a bagger for the JEWEL FOOD STORE for approximately 1 ½ months.

　　　　The victim TCF bank is located inside the JEWEL store where AREMKA was working.

　　　　AREMKA stated he was sweeping just outside the JEWEL FOOD STORE when a customer of the store instructed AREMKA to chase after someone who was running out of the store.  AREMKA stated the person running out of the JEWEL STORE had a fairly good lead on AREMKA and was running toward Bloomingdale Road toward what was described as an abandoned BOSTON CHICKEN RESTAURANT.

　　　　AREMKA stated he ran after the individual until they got to the other side of the parking lot near the BOSTON MARKET RESTAURANT location. AREMKA observed the individual get into the passenger side of a four door white Ford Explorer described by AREMKA as a 1996 to 1999 model year Ford Explorer in good condition. AREMKA stated the white Ford Explorer had a beige stripe on the bottom. AREMKA stated the Ford Explorer did not have fancy wheels and described the wheels as dull in color.

　　　　AREMKA stated the closest he got to the individual running from the bank to the Ford Explorer was approximately 20 yards which was around the time AREMKA and the person he was running after got to the Ford Explorer on the other side of the

---

Investigation on　10/25/03　　at　Glendale Heights, Illinois

File #　91A-CG-121158　　　　　　　　　Date dictated　10/27/03

by　SA CURTIS G. KOCH:pkk

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

thigpen

FD-302a (Rev. 10-6-95)

91A-CG-121158

Continuation of FD-302 of      DAVID L. **AREMKA**          , On 10/25/03 , Page   2

parking lot. AREMKA stated after entering the white Ford Explorer the Ford Explorer exited onto Bloomingdale Road which AREMKA described as the Springdale exit and drove north toward Roselle on Bloomingdale Road.

AREMKA stated he was closest to the rear passenger side of the white Ford Explorer when the individual got into the Ford Explorer. AREMKA stated he could not see inside of the Ford Explorer due to how dark it was and did not observe the driver of the Ford Explorer.

AREMKA provided the following descriptive information regarding the individual he chased across the parking lot:
black male, height 6'0", light build, wearing a light brown jacket with a black hooded sweatshirt and blue pants, possibly blue jeans.

The individual ran with both hands in his pockets. AREMKA could not recall the type of shoes the individual was wearing. AREMKA stated the individual was not too fast because he gained on him fairly quickly as he was running after him. AREMKA stated as the individual approached the passenger side of the white Ford Explorer the door seemed to fly open very quickly.

thigpen

0054

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of transcription _10/28/2003_

    IRIS M. REMINAJES, date of birth (DOB) March 28, 1982,
residence address 894 Regent Drive, Apartment 4, Dekalb, Illinois,
cell phone number (630) 965-9276 was interviewed at the GLENDALE
HEIGHTS POLICE DEPARTMENT by SPECIAL AGENT (SA) CURTIS G. KOCH and
GLENDALE HEIGHTS POLICE DEPARTMENT DETECTIVE SHERRY BALEY.  SA KOCH
identified himself as a Special Agent with the FEDERAL BUREAU OF
INVESTIGATION (FBI) explained the purpose and nature of the
interview to REMINAJES.  REMINAJES provided the following
information regarding a bank robbery at the TCF Bank, 2164
Bloomingdale Road, Glendale Heights, Illinois:

    REMINAJES stated she has worked as a teller for TCF BANK
for approximately 2 years.

    REMINAJES stated around closing time (approximately 8:00
p.m.) a bank robber approached teller position 4 which is
immediately adjacent to REMINAJES' teller position 3.  REMINAJES
stated another teller named JAY was returning to teller position 2
when the bank robber moved from teller position 4 to teller
position 2.  REMINAJES heard the bank robber ask JAY words to the
effect "Can I ask you a question".  REMINAJES stated the bank
robber began mumbling words some of which REMINAJES could not
understand.

    REMINAJES stated she observed the bank robber hold up a
blue "post-it" note which the bank robber held side ways.

    REMINAJES stated she did not see a gun although she did
observe the bank robber standing with his right hand in his pocket
which made it appear that he may have had a gun.

    REMINAJES stated JAY appeared to "freeze" in front of the
bank robber.  REMINAJES stated the bank robber told JAY to show him
JAY's teller drawer and was pointing at the drawer as he was giving
JAY the command.  REMINAJES stated after seeing JAY "freeze" in
front of the bank robber she told JAY to give the bank robber his
money.  REMINAJES stated the bank robber then leaned over the
teller counter and began pulling money out of JAY's teller drawer
with both hands and stuffing it into his pockets.

---

Investigation on _10/25/03_ at Glendale Heights, Illinois

File # _91A-CG-121158_      Date dictated _10/27/03_

by _SA CURTIS G. KOCH:pkk_

thigpen

00146

FD-302a (Rev. 10-6-95)

91A-CG-121158

Continuation of FD-302 of _____IRIS M. REMINAJES_____ , On _10/25/03_ , Page _2_

     REMINAJES provided the following descriptive information regarding the bank robber:

     black male, age 40 to 45, height 5'9", weight 170 to 180 pounds, wearing khaki cotton jacket with a dark colored hooded sweatshirt pulled over his head. The sweatshirt hid the bank robber's hair. The bank robber wore sunglasses, tinted pink, with gold frames in a square type pattern. REMINJAES stated she could see the bank robber's eyes through the sunglasses and described them as sleepy looking eyes.

     REMINAJES stated the bank robber had a manly deep voice.

     REMINAJES could not provide a description of the bank robber's pants or shoes. REMINAJES stated the bank robber's face had a bumpy appearance that may have been a result of acne.

thigpen

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of transcription    10/28/2003

     MELINDA M. BECKLEY, date of birth (DOB) October 16, 1973,
617 Swinford, Bartlett, Illinois, home telephone number (630) 830-
5714, cell phone number (630) 244-7426 was interviewed at the
GLENDALE HEIGHTS POLICE DEPARTMENT by Special Agent (SA) CURTIS G.
KOCH and GLENDALE HEIGHTS POLICE DEPARTMENT DETECTIVE SHERRY BALEY.
SA KOCH identified himself as a Special Agent (SA) with the FEDERAL
BUREAU OF INVESTIGATION (FBI) and explained the purpose and nature
of the interview to BECKLEY, BECKLEY voluntarily provided the
following information:

     BECKLEY stated she has worked for TCF BANK for the past 4
½ years at various locations and has been the Assistant Manager of
the TCF branch located at 2164 Bloomingdale Road, Glendale Heights,
Illinois for the past four months. The phone number for the TCF
BANK in Glendale Heights is (630) 351-4793.

     BECKLEY stated she first noticed the bank was being
robbed when a teller named JAY was taking too long to put his
teller drawer away.  BECKLEY stated as Assistant Manager her key
and a second tellers key is required to secure the teller drawers
for the night. BECKLEY stated when she began to approach JAY's
teller window to determine what was delaying his closing she
noticed the bank robber holding up a blue sticky note with the word
rob or robbery written on it.  BECKLEY stated she recalled making
an attempt to read the bank robbery note held by the bank robber.

     BECKLEY stated she heard the bank robber communicating
with the teller JAY and tried to observe the bank robber's face
during his communications with JAY. BECKLEY stated she heard the
bank robber tell JAY words to the effect "if you don't give me
money something bad will happen." BECKLEY stated Jay appeared very
nervous during the robbery.

     BECKLEY stated another teller named IRIS told JAY to give
the bank robber the money.  BECKLEY stated that up until this time
JAY was holding his teller drawer down at his side and was not
responding to the bank robbers demands. In response to IRIS, Jay
held up his teller drawer toward the bank robber. BECKLEY stated
the bank robber eventually reached over the teller counter and
began grabbing the money out of JAY's teller drawer.

---

Investigation on    10/25/03    at Glendale Heights, Illinois

File #  91A-CG-121158                    Date dictated    10/27/03

by    SA CURTIS G. KOCH:pkk

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION



Date of transcription    10/29/2003

    JAY A. CASTILLO, date of birth (DOB) November 14, 1982,
resident address 172 Quail Run Court, Unit 1B, Carol Stream,
Illinois, home telephone number (630) 665-9316, cell phone number
(630) 670-6516 was interviewed at the GLENDALE HEIGHTS POLICE
DEPARTMENT by SPECIAL AGENT (SA) CURTIS G. KOCH and GLENDALE
HEIGHTS POLICE DEPARTMENT DETECTIVE SHERRY BALEY.  SA KOCH
identified himself as a Special Agent with the FEDERAL BUREAU OF
INVESTIGATION (FBI) and explained the purpose and nature of the
interview to CASTILLO.  CASTILLO voluntarily provided the following
information regarding a bank robbery which occurred at the TCF
BANK, 2164 Bloomingdale Road, Glendale Heights, Illinois:

    CASTILLO stated he has been employed, since July of 2003,
as a teller for TCF BANK at their Glendale Heights facility, 2164
Bloomingdale Road, Glendale Heights, Illinois (Bloomingdale Road
and Army Trail Road).

    CASTILLO stated the bank robbery occurred shortly before
closing adding another teller after the bank robbery told CASTILLO
that her last transaction was posted at 7:56 p.m. which would have
been around the time of the robbery.

    CASTILLO stated he was preparing to put his teller drawer
away for the day in preparation for closing and was holding his
drawer in his hands as he approached his teller position.  CASTILLO
stated the bank robber approached his teller position and told
CASTILLO he had a question for CASTILLO.  CASTILLO stated the bank
robber stated words to the effect "let me see your drawer" at which
time CASTILLO stated the bank robber held up what CASTILLO
described as a blue post-it note with the word "robbery" written on
it.  CASTILLO stated the bank robber held the post-it note at an
angle adding that it was difficult for CASTILLO to read but added
he did make out the word "robbery" on the note.  CASTILLO stated
the bank robber then told CASTILLO with words to the effect "give
me the money or something bad will happen".

    CASTILLO stated during the time the bank robber was
giving CASTILLO directions, the bank robber had his right hand in
his pocket which gave CASTILLO the impression the bank robber may
have had a gun. CASTILLO stated the bank robber never stated he had
a gun and never displayed a gun to CASTILLO.

---

Investigation on    10/25/03    at  Glendale Heights, Illinois

File #  91A-CG-121158                              Date dictated    10/27/03

by    CURTIS G. KOCH:pkk

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

91A-CG-121158

Continuation of FD-302 of ___JAY A. CASTILLO_____, On _10/25/03_, Page __2__

       CASTILLO stated up until this point in time he had not provided the bank robber with his teller drawer. CASTILLO stated a female teller behind CASTILLO named IRIS told CASTILLO to give the bank robber his money. CASTILLO stated the bank robber reached over the teller counter with both hands and began grabbing the money from CASTILLO's teller drawer. CASTILLO stated the bank robber was leaning over his counter as he was grabbing the money out of CASTILLO's teller drawer. CASTILLO stated the bank robber stuffed the money into his pockets, turned around and left the bank.

       CASTILLO stated he was unaware of what became of the blue post-it note displayed to him by the bank robber.

       CASTILLO stated his teller drawer contained bait money but the bank robber did not take it. CASTILLO felt the bait money was not taken due to the fact it was located at the bottom of his teller drawer.

       CASTILLO described the post-it note as a blue 3 X 3 inch post-it note with robbery written across it in all capital letters. CASTILLO stated the note was held approximately 2 feet from his face when it was displayed to CASTILLO by the bank robber.

       CASTILLO provided the following descriptive information regarding the bank robber: black male, age 40's, height 5'8" to 5'10", weight 170 to 180 pounds, deep voice, beard and mustache, had a very calm demeanor, dark complexion, wearing a khaki cotton jacket, navy blue hooded sweatshirt with the hood pulled over his head, tinted sunglasses, blue jeans and dark brown shoes.

       CASTILLO stated as soon as the bank robber approached his teller counter CASTILLO recognized the bank robber as someone who attempted to cash a check through CASTILLO one or two months ago. CASTILLO stated the bank robber's face and voice matched that of the person who tried to cash the check. CASTILLO stated the person was unsuccessful in cashing the check due to the fact the person's account at TCF was in an overdraft position. CASTILLO stated the person cashing the check complained causing a TCF supervisor named TANVERR to interced. CASTILLO stated TANVERR may remember the incident and/or the customer's name and identity.

FD-395 (Rev. 2-28-97)

# ADVICE OF RIGHTS

Place _Elmhurst, IL_
Date _11/14/03_
Time _1037 hrs._

## YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed _____

Witness: _James S. Bergdy SA FBI Chicago IL 11/14/03_

Witness: _Det A. Bailey #335_

Time: _1037 hrs._

FD-302a (Rev. 10-6-95)

91A-CG-121158

Continuation of FD-302 of  __DOUGLAS M. THIGPEN_____ , On 11/14/03 , Page 2

because THIGPEN was attempting to get his life straightened out.
THIGPEN was no longer reporting to his drug program in Aurora,
Illinois because he had been using drugs again and knew that the
drugs would be detected.

On October 25, 2003, following the problems THIGPEN had
been having at DEVRY, HORACE SMITH (a.k.a. "CHEW") picked THIGPEN
up at his mother's apartment on Homestead Street in La Grange Park,
Illinois. At the time SMITH picked THIGPEN up, SMITH was driving
his white Ford Explorer. THIGPEN recalled that his mother was at
the apartment when he left with SMITH. It had been planned that
THIGPEN and SMITH would pick up a third person, MICHAEL JENKINS
(a.k.a. "CHUCKY"), who was going to be the person that was going to
go into the bank to commit the robbery. SMITH and THIGPEN traveled
to JENKINS' residence, described as being a house at the back of a
property off of 22nd Avenue in the Maywood/Bellwood area.

When THIGPEN and SMITH arrived a JENKINS' residence,
JENKINS was not there. THIGPEN and SMITH traveled to Glendale
Heights where SMITH gave THIGPEN a note to use to rob the TCF bank.
THIGPEN recalled the note saying words similar to: This is a
robbery, put the money in the bag. (THIGPEN could not recall what
the note was written on or what the note looked like.) SMITH had
instructed THIGPEN to go into the bank and to grab a drawer that
was being removed from the bank counter. SMITH had told THIGPEN
that the bank employees could not activate the bank's alarm with
the cash drawer removed. SMITH dropped THIGPEN off in the parking
lot in between the bank entrance and a billiard business. SMITH
then parked near the last aisle in the parking lot toward the
billiard business.

When he entered the bank, THIGPEN was both drunk and high
on drugs. He did not have a bag with him although the note said to
put the money in a bag. He went to the counter and reached into
the cash drawer and grabbed the money. He did not grab the entire
cash drawer as SMITH had instructed him to do because he did not
want to run while carrying the cash drawer. After grabbing the
money from the drawer, THIGPEN ran out of the bank. As he ran out
of the bank, SMITH pulled the Ford Explorer around the curb, out of
the view of JEWEL. THIGPEN did not have any knowledge of someone
chasing him across the parking lot. He did not threaten anyone and
did not have his hand in his pocket to act as if he had a gun.

Following the robbery, SMITH threw the bank robbery note
out of the window of the Ford Explorer while traveling on I290.

thigpen                                    00206

FD-302a (Rev. 10-6-95)

91A-CG-121158

Continuation of FD-302 of  __DOUGLAS M. THIGPEN__  . On 11/14/03 , Page  3

THIGPEN did not know how much money he got during the robbery and
gave the money to SMITH. THIGPEN was given $500.00 of the money.
THIGPEN and SMITH traveled to 1st Avenue in Maywood where they used
some of the money to buy drugs from ROBERT COLES (phonetic). They
stayed at COLES' house where they got drunk and high.

After the bank robbery was over, THIGPEN was depressed
that he had robbed a bank. He explained that he is not violent and
only is involved in writing checks. THIGPEN was nervous at the
time of the robbery and "drunk as hell." THIGPEN was mad because
he had let SMITH make him rob a bank. THIGPEN has told several
people that he had robbed the bank. He recalled telling his
sister, ARLENDER THIGPEN, and the person who lives at her home,
VERNON CANNON (phonetic), about robbing the bank. He had also told
BOSLEY. Although THIGPEN had not told his mother about the bank
robbery, he thought that she knew about it. This was because she
had asked him about his knowledge of the bank robbery in Glendale
Heights.

SMITH is approximately 50 years old. He has a cousin in
the Aurora, Illinois area. THIGPEN thinks that SMITH is currently
working for LIONS ELECTRIC though MANPOWER.

JENKINS is approximately 43 years old. At the time of
THIGPEN'S interview, JENKINS was in jail and had been in jail for
several days because of a warrant. JENKINS associates with an
unknown male from Berwyn, Illinois, who THIGPEN described as a
"light-skinned fellow."

THIGPEN knew of SMITH and JENKINS to do some robberies
together, including robberies in Aurora, Illinois. Vehicles that
SMITH and JENKINS would have access to included: SMITH's white Ford
Explorer, a white Pontiac, and a burgundy Oldsmobile or Buick.
THIGPEN has also known SMITH and JENKINS to rent different cars.

In regards to clothing THIGPEN wore during the robbery,
THIGPEN had become nervous and thrown away the "hoody" and
sunglasses he wore into the bank. The jacket was at his mother
apartment on Homestead Street in La Grange Park, Illinois. THIGPEN
gave SA KALEY and Det. BALEY consent to recover the jacket from his
mother's apartment and to search the U-HAUL truck he had been using
in Elmhurst. THIGPEN signed separate consent forms (FD-26 forms)
for the consent search of 1443 Homestead Street and the U-HAUL
truck.

thigpen

FD-302a (Rev. 10-6-95)

91A-CG-121158

Continuation of FD-302 of      DOUGLAS M. THIGPEN                          , On 11/14/03      , Page    4

        At approximately 12:45 PM, THIGPEN was asked to write a
handwritten statement regarding the bank robbery.  THIGPEN provided
the following signed statement:

        "To Whom it may concern with the U.S. Prosecutors office
that I robbed a bank with no gun and I did not Threaten anyone.  I
was coerced in Robbing That Bank by Horace Smith, who only gave me
$500.00.  I was under the Influence of Drugs and alcohol when this
offense occured.  I am not a Bank robber or a violent or Dangerous
person.  Please forgive me.

                           "DAte
                          11-14-03

                 "/s/ DOUG M. THIGPEN  .

        "/s/ ERIC R. KALEY - FBI - Chicago - West RA 11/14/03
        /s/ SHERRY L. BALEY Glendale Hts Police Sept 11/14/03

        The Advise of Rights form signed by THIGPEN, the original
signed statement of THIGPEN, the signed consent search form for the
Homestead address, and the signed consent search form for the U-
HAUL truck have been placed in 1-A envelopes for submission to the
case.

thigpen                                        00208

D.T

D.T. To Whom it may concern
with the U.S. Attorneys office
that I robbed a bank with no gun
and I did not Threaten anyone.
I was coerced in Robbing That
Bank by Horace Smith, Who
only gave me $500.00. I
was under the influence of
Drugs and alcohol When this
offense occured. I am not a
Bank robber or a Violent or
Dangerous person. Please forgive me D.T.

Date

DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF INVESTIGATION

## CONSENT TO SEARCH

1.  I have been asked by Special Agents of the Federal Bureau of
    Investigation to permit a complete search of:

    (Describe the person(s), place(s), or thing(s) to be searched.)

    1443 HOMESTEAD    #1-SOUTHWEST
    LA GRANGE PARK, ILLINOIS

2.  I have been advised of my right to refuse consent.

3.  I give this permission voluntarily.

4.  I authorize these agents to take any items which they determine may
    be related to their investigation.

    ___11/14/03___               x _____
        Date                                      Signature

        Witness                  _____

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    11/17/2003

CHRISTINE THIGPEN, date of birth July 15, 1927, residing at 1443 Homestead Road, #1-SW, La Grange Park, Illinois, telephone number (708)482-4108, was interviewed at her residence following a consent search for a jacket belonging to DOUGLAS THIGPEN. After being advised of the identities of SA KALEY and Detective (Det.) BALEY, the following actions took place and THIGPEN provided the following information:

At approximately 4:20 PM, SA KALEY and Det. BALEY made contact with THIGPEN at the door to her apartment. THIGPEN welcomed SA KALEY and Det. BALEY into the apartment, at which time, SA KALEY explained to THIGPEN that her son (DOUGLAS THIGPEN) had been charged by the Federal Bureau of Investigation (FBI) for a bank robbery. It was further explained to THIGPEN that DOUGLAS THIGPEN had given consent for SA KALEY and Det. BALEY to obtain his jacket from his bedroom in the apartment.

THIGPEN escorted SA KALEY and Det. BALEY to the southeast bedroom of the apartment. Upon entering the bedroom, Det. BALEY located a jacket fitting the description and appearance of the jacket worn during the bank robbery. The jacket was located on the back of the bedroom door, hanging on the door knob. The jacket was seized by Det. BALEY and turned over to SA KALEY.

After exiting the bedroom, THIGPEN was asked about her knowledge of DOUGLAS THIGPEN being involved in a bank robbery. When told that the bank was located on Bloomingdale Road in Glendale Heights, THIGPEN recalled the following:

THIGPEN remembered hearing something about the bank robbery in Glendale Heights. She had been told by her daughter, ARLENDER THIGPEN, that a bank had been robbed and that there were police all around the bank. ARLENDER THIGPEN had told her mother that she had gone to the bank to see if DOUGLAS THIGPEN had been the person who robbed the bank. THIGPEN explained that her daughter had told her that DOUGLAS THIGPEN, along with one of his friends, had been over at her house and had told her that they were going over to the bank. THIGPEN explained that, because DOUGLAS THIGPEN and his friend had told ARLENDER THIGPEN that they were going to the bank just before the robbery, ARLENDER THIGPEN thought DOUGLAS THIGPEN was involved in the bank robbery.

---

| Investigation on | 11/14/03 | at | La Grange Park, Illinois |
| --- | --- | --- | --- |

| File # | 91A-CG-121158 | | Date dictated | 11/17/03 |
| --- | --- | --- | --- | --- |

by  SA ERIC R. KALEY
Det. SHERRY BALEY

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    11/30/2003

      ARLENDER THIGPEN (A. THIGPEN), date of birth July 27,
1960, residing at 223 Lakeview Lane, Bloomingdale, Illinois,
telephone number (630)893-3911, was interviewed at her residence.
After being advised of the identity of the interviewing Agents and
after being advised that Agents wanted to speak with her about her
brother, DOUGLAS THIGPEN (D. THIGPEN), A. THIGPEN first stated that
she did not know anything about her brother's activities and did
not get involved in his business.  When A. THIGPEN was told that
Agents were investigating a bank robbery in Glendale Heights
involving D. THIGPEN and knew that D. THIGPEN had been at her
residence on the night of the bank robbery, A. THIGPEN provided the
following information:

      On the night of the bank robbery at TCF BANK in Glendale
Heights (October 25, ████), D. THIGPEN was over at A. THIGPEN's
residence.  D. THIGPEN had asked A. THIGPEN to borrow some money,
stating that he would have some money in a couple of days to pay
her back.  A. THIGPEN refused to let D. THIGPEN borrow any of her
money.  While at A. THIGPEN's residence, D. THIGPEN called his
friend "CHEW" to come and pick him up.  A. THIGPEN could not recall
if D. THIGPEN called "CHEW" from her home telephone or if he used
his cellular telephone.

      A. THIGPEN did not know "CHEW's" real name, only that he
drove a white sport utility truck.  (Agents showed A. THIGPEN a
photograph of HORACE SMITH, who A. THIGPEN identified as being the
person she knew as "CHEW")  A. THIGPEN does not like "CHEW" and
does not like him coming over to her house.  She explained that
every time D. THIGPEN was around "CHEW", D. THIGPEN ended up
getting in trouble and going to jail.

      After D. THIGPEN called "CHEW" on the night of the
robbery, "CHEW" arrived at A. THIGPEN's residence in his white
sport utility truck.  "CHEW" came into A. THIGPEN's house and was
waiting for D. THIGPEN.  While in the house, A. THIGPEN overheard
"CHEW" tell D. THIGPEN several times to hurry up because they had
to be somewhere before 8:00.  A. THIGPEN did not know where "CHEW"
and D. THIGPEN were going, but understood that they were planning
to be somewhere before 8:00 p.m. on that night.

---

Investigation on    11/25/2003    at  Bloomingdale, Illinois

File #  91A-CG-121158

SA ERIC R. KALEY                            Date dictated    11/30/2003

by    SA PATRICK J. MURPHY

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

91A-CG-121158

Continuation of FD-302 of ___ARLENDER THIGPEN_____ , On 11/25/2003 , Page ___2___

      Since A. THIGPEN did not like "CHEW", she eventually told him to go outside of the house to wait for D. THIGPEN. "CHEW" exited the house and went to his white sport utility truck, where he waited for D. THIGPEN. At about this same time, A. THIGPEN left the house to go to the gas station and then to go shopping at the JEWEL food store, where the TCF BANK was located. When A. THIGPEN left the house, "CHEW" was sitting in his white sport utility truck in A. THIGPEN's driveway.

      A. THIGPEN went from her home to a nearby gas station. After leaving the gas station, A. THIGPEN arrived at the JEWEL food store on Bloomingdale Road where she saw a large number of police cars. A. THIGPEN had also seen "CHEW's" white sport utility truck in the parking lot of JEWEL, so she thought that D. THIGPEN might have been arrested for passing checks, which she knew him to be involved in. When she saw "CHEW's" truck, there was no one inside the truck. She did not see either D. THIGPEN or "CHEW" at the JEWEL.

      On Sunday, the day following the robbery (October 26, ██████), A. THIGPEN was talking with her mother on her home telephone. While speaking to her mother, D. THIGPEN was at their mother's house. D. THIGPEN picked up one of the telephones at his mother's house, so that he was on the line with both A. THIGPEN and their mother. While on the line, D. THIGPEN said that he and "CHEW" had robbed a bank, but A. THIGPEN did not pay attention to what he was saying because she did not think he was serious.

      A. THIGPEN told Agents she would attempt to locate other people who might have knowledge of the bank robbery and knowledge of "CHEW's" involvement in the robbery. A. THIGPEN was provided with one of SA KALEY's business cards for future contact. A. THIGPEN was confident that she could identify "CHEW's" truck if she saw a picture of it.

FD-302 (Rev 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/01/2004

     HORACE SMITH, date of birth October 28, 1956, Social
Security Account Number (SSAN) 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, residing at 604 South
8th Avenue, Maywood, Illinois, telephone number (708) 344-0103, was
interviewed outside of his residence.  After being advised of the
identities of the interviewing Agents and the purpose of the
interview, SMITH provided the following information regarding the
October 25, 2003 bank robbery of TCF BANK, located inside the JEWEL
FOOD STORE (JEWEL) at 2164 Bloomingdale Road, Glendale Heights,
Illinois:

     SMITH has known DOUGLAS THIGPEN for approximately 7
years.  During this time, SMITH has known THIGPEN to be involved
"off and on" in drugs and drinking alcohol.  In October of 2003,
SMITH thought that THIGPEN was living at his mother's house, which
was thought to be located somewhere near La Grange, Illinois.

     SMITH was asked about his presence with THIGPEN at the
JEWEL in Glendale Heights, Illinois when THIGPEN took money from a
bank located inside the JEWEL.  SMITH stated that on the night in
question, SMITH was at his house in Maywood when he received a
telephone call from THIGPEN at approximately 6:00 p.m. or 7:00 p.m.
At the time of the call, THIGPEN was at his sister's house in
Bloomingdale, Illinois.  SMITH explained that THIGPEN did not have
any way of getting from place to place, so THIGPEN had called SMITH
and asked SMITH to pick him up at his (THIGPEN's) sister's house.
(SMITH thought that THIGPEN's sister's name was LINDA, which he
said was possibly the same person as ARLENDER THIGPEN.)  SMITH had
been to THIGPEN's sister's house on a previous occasion and was
given direction by THIGPEN on how to get to the house.

     SMITH drove his white Ford Explorer to pick up THIGPEN.
When he got to THIGPEN's sister's house, he stayed at the house for
about 10 minutes.  SMITH recalled that THIGPEN, the person he knew
as LINDA, and several kids were at the house.  THIGPEN told SMITH
that he needed SMITH to drive him to a nearby store so that he
(THIGPEN) could get his sister some groceries.  SMITH and THIGPEN
left the sister's house in SMITH's white Ford Explorer.  SMITH
thought that THIGPEN may have been drinking alcohol previous to
SMITH arriving to pick him up.  Once in SMITH's Explorer, THIGPEN
gave SMITH directions to a nearby JEWEL.  SMITH drove THIGPEN to
the JEWEL and parked in the "far part of the parking lot," away

---

Investigation on    06/01/2004    at Maywood, Illinois

File #  91A-CG-121158                              Date dictated

    SA ERIC R. KALEY
by  SA BRUCE E. HARFORD

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

91A-CG-121158

Continuation of FD-302 of _____HORACE SMITH_____ , On 06/01/2004 , Page ___2

from the front of the store. After SMITH parked, THIGPEN got out of the Explorer and told SMITH that he would be right back.

Once THIGPEN got out of the Explorer, SMITH shut the car off and waited in the parking lot. SMITH estimated that THIGPEN was gone for approximately 10-15 minutes. THIGPEN then came running back to the Explorer from the store. When he got into the car, SMITH thought THIGPEN said words similar to, "Alright, I'm ready to go." SMITH could not recall exactly what THIGPEN said after getting back into the car, but SMITH understood THIGPEN to imply that THIGPEN had seen his sister inside of JEWEL and had given her whatever it was he was getting for her at the store.

As SMITH and THIGPEN were traveling in the Explorer from JEWEL, SMITH had noticed that THIGPEN was breathing hard. THIGPEN told SMITH that he (THIGPEN) had "snatched some money." SMITH did not know if THIGPEN had taken the money from JEWEL or from the bank located inside of the JEWEL. When SMITH asked THIGPEN why he had taken the money, THIGPEN said that he knew that SMITH would not have taken him to the store if SMITH had known that THIGPEN was going to take the money. SMITH then drove THIGPEN from the JEWEL in Glendale Heights back to the Maywood area, where SMITH dropped THIGPEN off at a store located near the intersection of Interstate 290 and 25th Avenue.

SMITH has not seen THIGPEN since the night that he took THIGPEN to the JEWEL in Glendale Heights. SMITH could not recall the clothing that THIGPEN was wearing on the night in question but thought THIGPEN was possibly wearing a sweatshirt. SMITH had never written a bank robbery demand note for THIGPEN, had never seen THIGPEN with a demand note, and had not thrown any notes out of the window while he and THIGPEN were traveling from the JEWEL back to the Maywood area. SMITH had never seen THIGPEN with the money he had taken from the bank and was not given any of the money by THIGPEN. SMITH did not go with THIGPEN to anyone's house after THIGPEN had taken the money from the bank. SMITH does not know anyone by the name of ROBERT COLE or ROBERT COLES and has not been to COLE's or COLES' house to get drunk and take drugs.

Approximately 5 months ago, SMITH had heard that THIGPEN had been arrested for bank robbery and thought that the FEDERAL BUREAU OF INVESTIGATION (FBI) would be coming to talk to him. SMITH thought that ANDREA BOSLEY, a former girlfriend of THIGPEN's, had told SMITH about THIGPEN's arrest. Since originally being told of the arrest, SMITH more recently had heard that THIGPEN was out

FD-302a (Rev. 10-6-95)

91A-CG-121158

Continuation of FD-302 of _____HORACE SMITH_____, On _06/01/2004_ , Page ___3___

of jail. SMITH did not think that THIGPEN was the kind of person who would rob a bank and had never known THIGPEN to be involved in any other robberies. SMITH had not heard that THIGPEN's sister was robbed shortly after the date that THIGPEN had robbed the bank in JEWEL.

It was explained to SMITH that it was very important that he be honest regarding the events of the night of the bank robbery. SMITH advised that he was telling the truth. SMITH was advised by Agents that he may, at a later date, be requested to testify to the events surrounding the bank robbery, to which SMITH said words to the effect of, "I can only tell what I know." SMITH was asked how he thought he would do on a polygraph exam and replied that he was being truthful and thought that he would do alright.

(At the time of the interview, SA HARFORD asked SMITH what car he was driving on the night he took THIGPEN to the JEWEL. SMITH physically pointed to a white Ford Explorer with beige trim that was parked at the southwest corner of SMITH's house. SMITH identified the Explorer as his car.)



**FILED**

DEC 0 9 2003

MAGISTRATE JUDGE IAN H. LEVIN
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )      No. 03 CR 1084
                                     )
         v.                      )      Violation: Title 18, United States
                                       )      Code, Section 2113(a)
DOUGLAS M. THIGPEN                )

**JUDGE SHADUR**

The SPECIAL AUGUST 2003-1 GRAND JURY charges:      **MAGISTRATE JUDGE KEYS**

On or about October 25, ███ at Glendale Heights, in the Northern District of Illinois,

Eastern Division,

DOUGLAS M. THIGPEN,

defendant herein, by force and violence, or by intimidation, took from the person and presence of

a bank teller approximately ███ in United States currency belonging to and in the care,

custody, control, management, and possession of TCF Bank, located at 2164 Bloomingdale

Road, Glendale Heights, Illinois, the deposits of which were then insured by the Federal Deposit

Insurance Corporation;

In violation of Title 18, United States Code, Section 2113(a).

A TRUE BILL:

**DOCKETED**
DEC 0 9 2003

FOREPERSON

UNITED STATES ATTORNEY

Ex. "A"

**IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHISN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**FILED**

AUG 2 7 2004

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) No.  03 CR 1084 |
| v. | ) Judge Milton IMBERGER W. DOBBINS |
| | ) CLERK, U.S. DISTRICT COURT |
| DOUGLAS THIGPEN | ) |

**DOCKETED**

AUG 3 0 2004

## PLEA DECLARATION

The defendant, DOUGLAS THIGPEN, after extensive consultation with his attorney, GARETH G. MORRIS, acknowledges and states the following:

1. He has been charged by Indictment with one count of bank robbery in violation 18 U.S.C. §2113(a).

2. He has read the charge against him contained in the Indictment and that charge has been fully explained to him by his attorney.

3. He fully understands the nature and elements of the crime with which he has been charged.  More specifically, defendant understands that the following are the elements of the offense of Bank Robbery (18 U.S.C. §2113(a)) to which he is pleading guilty:

A)    The defendant by force and violence, or by        intimidation,
B)    took from the person and presence of a bank teller,
C)    money
D)    belonging to and in the care, custody, control management, or possession of  a bank, and
E)    the deposits of the bank were then insured by the Federal Deposit Insurance Corporation.

1

27

4. He will enter a voluntary plea of guilty to violating 18 U.S.C. §2113(a), as charged in the Indictment (Exhibit "A").

Factual Basis

5. He will plead guilty because he is in fact guilty of committing bank robbery. In pleading guilty, Mr. Thigpen acknowledges the following:

Potential Penalties

6. Mr. Thigpen understands that the charge to which he will plead carries a maximum sentence of 20 years, and a maximum fine of $250,000 (18 U.S.C. §3571). (Furthermore, Mr. Thigpen understands that guideline §5D1.1, if applicable, requires a term of supervised release of 2 to 3 years).

7. Mr. Thigpen understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, he will be assessed $100, in addition to any other penalty imposed.

8. Mr. Thigpen understands that full restitution pursuant to 18 U.S.C. §3663A is mandatory, and that restitution will be ordered in this case.

Guidelines Calculations

9. For the purposes of applying the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the following are Mr. Thigpen positions concerning potential application of the any applicable sentencing guidelines:

(a) It is the position of Mr. Thigpen that the federal sentencing guidelines can no

2

longer be applied to his case in the wake of *Blakely v. Washington*, 2004 U.S. LEXIS 4573

(2004). Mr. Thigpen urges this Court to hold that structure unconstitutional and

sentence him without regard to the sentencing guidelines within an indeterminate

range of probation to 20 years.

(b) In the alternative, if this Court somehow finds that parts of the Federal

Sentencing Guidelines survive *Blakely*, Mr. Thigpen acknowledges that the main

guideline provision applicable to his case is U.S.S.G. § 2B3.1.

10.  Mr. Thigpen acknowledges that the probation office and the government will

conduct their own investigations and that the Court ultimately determines the sentence.

Trial Rights and Appellate Rights

11.  Mr. Thigpen understands that by pleading guilty he surrenders certain

rights, including the following:

(a)  If defendant maintained his plea of not guilty to the charge against him, he

would have the right to a public and speedy trial.  The trial could be either a jury trial or

a trial by the judge sitting without a jury.  The defendant has a right to a jury trial.

However, in order that the trial be conducted by the judge sitting without a jury, the

defendant, the government and the judge all must agree that the trial be conducted by

the judge without a jury.

(b)  If the trial is a jury trial, the jury would be composed of twelve laypersons

selected at random.  Defendant and his attorney would have a say in who the jurors

would be by removing prospective jurors for cause whose actual bias or other

3

disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt.

(c) If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

(d) At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. He would be under no obligation to do so, however, because he is presumed to be innocent and, therefore, need not prove his innocence. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

(e) At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

12. Mr. Thigpen understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. By pleading guilty Mr. Thigpen admits he is guilty and

4

agrees that he should be found guilty. Mr. Thigpen's attorney has explained those rights to him, and the consequences of his waiver of those rights. Mr. Thigpen further understands that he is waiving appellate issues that might have been available if he had exercised his right to trial, and only may appeal issues not relating to his right to trial such as the sentence imposed.

Limitations and Consequences of this Plea Declaration

13. Mr. Thigpen understands that the United States Attorney's Office will fully apprize the District Court and the United States Probation Office of the nature, scope and extent of his conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing. Mr. Thigpen further understands that he will be able to present evidence in mitigation at the time of sentencing.

14. Mr. Thigpen understands that at the time of sentencing, the government and the defendant will be free to make their respective recommendations to the Court as they deem appropriate.

15. Should the Court refuse to accept Mr. Thigpen's plea of guilty, this Plea Declaration shall become null and void and defendant will not be bound thereto. It is the defendant's position that, should the Court decline to accept Mr. Thigpen's plea, this Plea Declaration and the ensuing court proceedings are inadmissible in later court proceedings pursuant to Rule 11 of the Rules of Criminal Procedure and Rule 410 of the Rules of Evidence.

5

16.  Mr. Thigpen agrees that this Plea Declaration shall be filed and become part of the record of the case.

17.  Mr. Thigpen and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, to induce him to plead guilty. Mr. Thigpen further acknowledges that he has read this Plea Declaration and carefully reviewed each provision.

Signed this _____27_____ day of August, 2004

_____
Douglas M. Thigpen, Defendant

_____
Gareth G. Morris
1704 N. Dayton St., Suite 100
Chicago, Illinois 60614
(312) 943-6178
Attorney for Defendant

22

1 government would be able to prove this.  How would you go about

2 proving the element of the offense having to do with insurance?

3          MR. FOX:  Your Honor, there are records that are kept

4 by the bank that show that they are insured by the Federal

5 Deposit Insurance Corporation.  Banks keep certificates that

6 allow -- that show that they are if need be, if it weren't to

7 be by stipulation as you know occurs most of the time in these

8 cases, we would call either a bank representative or expert

9 witness in the matter, who would then explain that TCF Bank was

10 indeed insured by the Federal Deposit Insurance Corporation on

11 October 25th, 2003.

12          THE COURT:  Is there any doubt, Mr. Morris, Mr.

13 Thigpen, that the government would be able to prove that

14 element of the offense?

15          MR. MORRIS:  No, your Honor.  In fact I contacted the

16 FDIC the last couple of days and received written verification

17 that this particular bank was insured on that date, because I

18 obviously didn't want Mr. Thigpen to admit a fact that could

19 not be proved.

20          THE COURT:  Mr. Thigpen, that's your understanding

21 also?

22          DEFENDANT THIGPEN:  Yes, your Honor.

23          THE COURT:  Okay.  How then do you now plead to this

24 charge in Count 1, guilty or not guilty?

25          DEFENDANT THIGPEN:  Guilty, your Honor.

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*FILED*

MAY 2 3 2005
MAR 23 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | No.  03 CR 1084 |
| v. | ) | |
| | ) | Judge Milton I. Shadur |
| DOUGLAS THIGPEN, | ) | |
| Defendant. | ) | |

SUPPLEMENTAL SENTENCING MEMORANDUM: THE GOVERNMENT HAS NOT
MET ITS BURDEN OF PROOF TO SHOW THIGPEN IS A CAREER OFFENDER UNDER
ADVISORY GUIDELINE §4B1.1.

Defendant, Douglas Thigpen ("Thigpen"), respectfully objects to, and moves the
court to strike from the Presentence Report dated December 23, 2004 ("PSR"), certain
specific prior convictions alleged to constitute predicate career offender offenses
under guideline §4B1.1.  Thigpen also moves the court, notwithstanding *Almendarez-
Torresv. United States*, 523 U.S. 224 (1998), to strike from the PSR (and not consider in
sentencing all prior convictions asserted to be career offender predicate offenses
under guideline §4B1.1.

1.    In pleading guilty, Thigpen accepted responsibility, but did not admit any prior
convictions. See Plea Declaration.  He has not and does not admit the accuracy of the
list of prior convictions in the PSR. In fact, the PSR's listing and characterization of his
purported prior convictions is patently inaccurate. Further, the Government's Version
directly contradicts the PSR's identification of a "controlled substance" offense,
casting into doubt the accuracy of the entire Presentence Report.

2.   For example, according to the PSR, Thigpen was sentenced on February 20, 1992 (PSR at 16, lines 385 – 391) for a "battery" qualifying as a "crime of violence" under guideline §4B1.2. But, this conviction appears not to be a crime "punishable by imprisonment for a term exceeding one year" as required by guideline §4B1.1. This was a scuffle with a guard at psychiatric cell while Thigpen was in jail. The guard provoked the incident by poking Thigpen in the chest. Whoever 'started it'; this appears to be a misdemeanor charge, brought only *after* Thigpen filed a civil rights suit against the guard. The PSR states Thigpen was sentenced to <u>17 days</u> to "run concurrent", though concurrent to what is not revealed.

3.   Even if this incident is technically a predicate offense under §4B1.1, this is not what Congress and the Sentencing Commission had in mind when adopting the three-strike career offender laws. To use this as a basis for enhancing Thigpen's sentence would produce an excessive and therefore unjust sentence. Fortunately *Booker* now permits this court in the interests of justice to decide that such a minor conviction should not be used to impose an enhancement that would add <u>6 years</u> to Thigpen's sentence. Further, doing so could violate the 18 U.S.C. §3553 requirement that a sentence be "sufficient, but not greater than necessary...", even if it is not cruel and unusual punishment. There are other equally shaky predicate offenses listed in the PSR.

4.   The alleged June 24, 1994 "controlled substance" prior conviction, 92CR26762, (PSR at 16, lines 392-403) involves someone other than the defendant. The probation officer's discussion effectively concedes that the court records on which she relied must be erroneous because they show Thigpen being sentenced to a consecutive sentence with another case where he was not the defendant! (PSR, page 16, lines 401 – 402). The 'fact' of a prior conviction, in which the <u>defendant is not the person sentenced</u>, lacks, to say the least, the reliability of a prior judicial determination. So

2

here the logic of the *Almendarez-Torres* exception is entirely lacking. As discussed below, *Almendarez* itself is on shaky foundations, but particularly in light of *Shepard v. United States*, slip opinion, March 7, 2005, it would be error to extend it to a record which confuses defendant's and another's sentences and prior convictions!

5.   The above June 24, 1994 conviction (and its three criminal history points) should be struck for another reason. The PSR states that its factual determination is based on police arrest reports (PSR, lines394-5). These are generally less reliable (see *Shepard*), and, more importantly, the record is unclear as to whether Thigpen plead to a simple possession offense or possession with intent to deliver. What can be determined, and is admitted by the government, is that the charge involved $71 worth of cocaine. (See Nov. 4, 1992 Complaint attached to the Government's Version of the Offense). Again, this is not the type of predicate offense properly counted under §4B1.1.

6.   In the Government's Version of The Offense, dated September 7, 2004, the government identifies (and attaches supporting documents) concerning another claimed "controlled substance offense" -- 93 MC 300797301. While the government states that there was a conviction and a four year sentence to run concurrently (Government's Version at page 4), this conviction appears not to have ever occurred, at least in relation to this charge.   First, this conviction is not mentioned anywhere in the Presentence Report. Second, the Certified Statement of Conviction/ Disposition for case - - 93 MC 300797301 - - as well as two other handwritten docket sheets for the same case, indicate the charge was dismissed -- "*nolle prosse*". Thigpen therefore moves to strike from the Government's Version, which is attached to the PSR and incorporated into it by reference, all references to the purported "controlled substance" conviction 93 MC 300797301.

7.   As vividly illustrated above, the process of finding 'facts' relating to Thigpen's prior convictions was riddled with errors and produced an inaccurate PSR not even

3

consistent with the Government's Version of Thigpen's criminal history. In light of this, and because even an advisory determination that Thigpen is a career offender can have a dramatic effect on his punishment, the fact of any prior conviction should be determined by the jury (or admitted) as required by the 6th Amendment. Defendant therefore moves to strike from the PSR (and from the Government's Version of the Offense, pages 4-5) the five purported prior convictions characterized as either a "crime of violence" or a "controlled substance offense" under §4B1.1. There is no constitutionally valid reason to except from the 6th Amendment prior convictions that materially enhance a defendant's sentence under the career offender guideline. The "fact of prior conviction" exception in *Almendarez-Torres* is unconstitutional in light of the reasoning in *Blakely*. As Justice Thomas recently wrote "...a majority of the Court now recognizes that *Almendarez-Torres* was wrongly decided." *Shepard v. United States* 544 U.S. ___ (2005) (J. Thomas, concurring in part and concurring in the judgment).

8. Whether a court is required to impose sentence on such judge-found facts (as in *Blakely*), or merely required to calculate an advisory guideline sentence (under *Booker*), there is a 6th Amendment violation because defendant's sentence is being increased materially based on facts found only by the court. Because it appears to be the government's recent position that any sentence within the guidelines is *per se* "reasonable" under *Booker* -- as argued to the 7th Circuit in *Paladino* -- the distinction between a mandatory career offender guideline sentence, and a sentence advised by the finding that defendant is a career offender based on judge-found facts, has become quite blurry.

9. Even if the court determines that *Almendarez* must be followed, the government has manifestly failed to meet its burden to show by a preponderance of the evidence that Thigpen fits within guideline 4B1.1. The rag-tag list of offenses offered in the PSR

4

is riddled with errors, and even those that are not obviously erroneous involve very minor non-violent offenses.

**WHEREFORE,** Defendant DOUGLAS THIGPEN moves the court:

To strike from the PSR, and not consider, any and all 'facts relating to prior convictions' that are purportedly "crimes of violence" or "controlled substance offenses" under guideline §4B1.2, because to do so would violate Thigpen's rights under the 6th Amendment to the Constitution;

To strike, and not consider, the offenses discussed above that are identified in the PSR at lines 386-391 and lines 392 – 403, page 16, and in the Government's Version of the Offense, paragraphs 1-5 at pages 4-5; and

To find that the government has not met its burden to show by a preponderance of the evidence that defendant fits within the advisory career offender guideline (§4B1.1) and that his advisory guideline offense level should therefore not be enhanced under this provision.

Respectfully submitted,

Gareth G. Morris
1704 N. Dayton St., Suite 100
Chicago, Illinois 60614
(312) 943-6178
Attorney for Defendant Douglas Thigpen

## CERTIFICATE OF SERVICE

The undersigned certifies that he served this SUPPLEMENTAL SENTENCING MEMORANDUM on Brandon Fox, Esq., Assistant United States Attorney, 219 South Dearborn, Chicago, Illinois 60604 on March 22, 2005.

Gareth G. Morris